# CIRCUIT COURT U. S.

## CHARLESTON, (S. C.) AUGUST, 1823.

| | |
|---|---|
| Ex parte *Henry Elkison,* a subject of His Britannic Majesty, vs. *Francis G. Deliesseline,* Sheriff of Charleston District. | HABEAS CORPUS HOMINE REPLEGIANDO. |

This was a case of an arrest of a British seaman, under the 3d section of an act of the state of South Carolina, entitled " An act for the better regulation of Free Negroes and Persons of Color, and for other purposes," passed in December, 1822.

JOHNSON, Justice. The motion submitted by Mr. King, in behalf of the prisoner, is for the writ of *habeas corpus ad subjiciendum ;* and if he should fail in this motion, then for the writ *de homine replegiando ;* the one regarding the prisoner in a criminal, the other in a civil aspect : the first motion having for its object his discharge from confinement absolutely ; the other his discharge on bail, with a view to try the question of the validity of the law under which he is held in confinement.

A document in nature of a return, under the hand and seal of the sheriff, has been laid on my table by the gentlemen who conduct the opposition, from which it appears, that the prisoner is in the sheriff's custody, under an act of this state, passed in December last ; and, indeed,

the whole cause has been argued under the admission, that he is in confinement under the third section of that act, as he states in his petition.

The act is entitled, " an act for the better regulation of free negroes and persons of color, and for other purposes." And the third section is in these words: " that if any vessel shall come into any port or harbor of this state, from any other state, or foreign port, having on board any free negroes, or persons of color, as cooks, stewards, or mariners, or in any other employment on board of said vessel, such free negroes, or persons of color shall be liable to be seized, and confined in gaol, until such vessel shall clear out and depart from this state : and that when said vessel is ready to sail, the captain of said vessel shall be bound to carry away the said free negro, or free person of color, and to pay the expenses of his detention; and in case of his neglect or refusal so to do, he shall be liable to be indicted; and on conviction thereof, shall be fined in a sum not less than one thousand dollars, and imprisoned not less than two months ; and such free negroes, or persons of color, shall be deemed and taken as absolute slaves, and sold in conformity to the provisions of the act passed on the 20th December, 1820, aforesaid."

As to the description or character of this individual, it is admitted, that he was taken by the sheriff, under this act, out of the ship Homer, a British ship trading from Liverpool to this place. From the shipping articles it appears that he was shipped in Liverpool ; from the captain's affidavit, that he had known him several

Vol. II.　　　　8

CHARLE'N, years in Liverpool, as a British subject, and from his own
August, 1823. affidavit, that he is a native subject of Great Britain, born
Elkison in Jamaica.
v.
Deliesseline.

In support of this demand on the protection of the United States, the British consul has also presented his claim of this individual, as a British subject, and with it the copy of a letter from Mr. Adams to Mr. Canning, of June 17th last, written in answer to a remonstrance of Mr. Canning, against this law. Mr. Adams' letter contains these words : " With reference to your letter of the 15th February last, and its enclosure, I have the honor of informing you, that immediately after its reception measures were taken by the government of the United States for effecting the removal of the cause of complaint set forth in it, which it is not doubted have been successful, and will prevent the recurrence of it in future."

This communication is considered by the consul as a pledge, which this court is supposed bound to redeem. It had its origin thus :

Certain seizures under this act were made in January last, some on board of American vessels, and others in British vessels ; and among the latter, one very remarkable, for not having left a single man on board the vessel to guard her in the captain's absence.

Applications were immediately made to me in both classes of cases, for the protection of the United States' authority ; in consequence of which I called upon the district attorney for his official services. Several reasons concurred to induce me to instruct him to bring the

subject before the state judiciary.  I felt confident that
the act had been passed hastily, and without due consid-
eration ; and knowing the unfavorable feeling that it
was calculated to excite abroad, it was obviously best
that relief should come from the quarter from which pro-
ceeded the act complained of.  Whether I possessed the
power or not to issue the writ of habeas corpus, it was
unquestionable, that the state judges could give this sum-
mary relief, and I, therefore, instructed Mr. Gladsden to
make application to the state authorities, and to do it in
the manner most respectful to them.  In the mean time
I prevailed on the British consul, the late Mr. Moody,
and the northern captains, to suppress their complaints,
fully confident that when the subject came to be investi-
gated they would be no more molested.  The applica-
tion was made to the state authority, and the men were
relieved ; but the ground of relief not being in its nature
general or permanent, Mr. Moody made his representa-
tions to Mr. Canning ; and the northern captains, I am
informed, did the same to congress, or to the executive.
What passed afterwards, came to my knowledge in such
a mode, that, after what has publicly transpired on this
argument, I do not think proper, as it certainly is not
necessary, to declare it.  A gentleman in this place
(Col. Hunt) has declared, that he is authorized to deny
that Mr. Adams was sanctioned by any thing that trans-
pired between himself and any member of the state del-
egation, to give such a pledge.  Certain, however, it is,
that from that time the prosecutions under this act were
discontinued, until lately revived by a voluntary associa-
tion of gentlemen, who have organized themselves into
a society to see the laws carried into effect.  And here,
as I well know the discussion that this occurrence will

CHARLE'N,
August, 1823.

Elkison
v.
Deliesseline.

CHARLE'N,
August, 1823.

Elkison
v.
Deliesseline.

give rise to, I think it due to the state officers to remark, that from the time that they have understood that this law has been complained of on the ground of its unconstitutionality, and injurious effects upon our commerce and foreign relations, they have shown every disposition to let it sleep. On the present occasion, the attorney general has not appeared in its defence. The opposition to the discharge of the prisoner has been conducted by Mr. Holmes, the Solicitor of the Association, and by Col. Hunt. As there is nothing done clandestinely, or disavowed, there can be no offence given by a suggestion which means no more than to show that pressing the execution of the law, at this time is rather a private than a state act ; and to furnish an explanation that may eventually prove necessary to excuse Mr. Adams to Mr. Canning, and, perhaps, to excuse some member of the state delegation to Mr. Adams.

Certain it is, that I cannot officially take notice of Mr. Adams' letter. However sufficient for Mr. Canning to rely on, it is not legally sufficient to regulate my conduct, or vest in me any judicial powers. The facts which I have communicated will, I hope, be sufficient to show that our administration has acted in good faith with that of Great Britain.

Two questions have now been made in argument; the first on the law of the case, the second on the remedy.

On the unconstitutionality of the law under which this man is confined, it is not too much to say, that it will not bear argument.; and I feel myself sanctioned in using this strong language, from considering the course of rea-

soning by which it has been defended. Neither of the

gentlemen has attempted to prove that the power therein assumed by the state, can be exercised without clashing with the general powers of the United States to regulate commerce; but they have both strenuously contended, that *ex necessitate* it was a power which the state must and would exercise, and, indeed, Mr. Holmes concluded his argument with the declaration, that, if a dissolution of the union must be the alternative, he was ready to meet it. Nor did the argument of Col. Hunt deviate at all from the same course. Giving it in the language of his own summary, it was this: South Carolina was a sovereign state when she adopted the constitution—a sovereign state cannot surrender a right of vital importance—South Carolina, therefore, either did not surrender this right, or still possesses the power to resume it—and whether it is necessary, or when it is necessary, to resume it, *she is herself the sovereign judge.*

But it was not necessary to give this candid expose of the grounds which this law assumes; for it is a subject of positive proof, that it is altogether irreconcilable with the powers of the general government; that it necessarily compromits the public peace, and tends to embroil us with, if not separate us from, our sister states; in short, that it leads to a dissolution of the Union, and implies a direct attack upon the sovereignty of the United States.

Let it be observed that the law is, "if any vessel," (not even the vessels of the United States excepted,) "shall come into any port or harbor of this state," &c., bringing in free colored persons, such persons are to

become " *absolute slaves*," and that, without even a form of trial, as I understand the act, *they are to be sold*. By the next clause, the sheriff is vested with *absolute power*, and expressly enjoined to carry the law into effect, and is to receive the one half of the proceeds of the sale.

The object of this law, and it has been so acknowledged in argument, is to prohibit ships coming into this port employing colored seamen, whether citizens or subjects of their own government or not. But if this state can prohibit Great Britain from employing her colored subjects, (and she has them of all colors on the globe,) or if at liberty to prohibit the employment of her subjects of the African race, why not prohibit her from using those of Irish or of Scottish nativity ? If the color of his skin is to preclude the Lascar or the Sierra Leone seaman, why not the color of his eye or his hair exclude from our ports the inhabitants of her other territories ? In fact it amounts to the assertion of the power to exclude the seamen of the territories of Great Britain, or any other nation, altogether. With regard to various friendly nations it amounts to an actual exclusion in its present form. Why may not the shipping of Morocco or of Algiers cover the commerce of France with this country, even at the present crisis? Their seamen are all colored, and even the state of Massachusetts might lately, and may perhaps now, expedite to this port a vessel with her officers black, and her crew composed of Nantucket Indians, known to be among the best seamen in our service.—These might all become slaves under this act.

If this law were enforced upon such vessels, retalia-

tion would follow ; and the commerce of this city, feeble and sickly, comparatively, as it already is, might be fatally injured.   Charleston seamen, Charleston owners, Charleston vessels, might, *eo nomine*, be excluded from their commerce, or the United States involved in war and confusion.   I am far from thinking that this power would ever be wantonly exercised, but these considerations show its utter incompatibility with the power delegated to congress to regulate commerce with foreign nations and our sister states.

Apply the law to the particular case before us, and the incongruity will be glaring.   The offence, it will be observed, for which this individual is supposed to forfeit his freedom, is that of coming into this port in the ship Homer, in the capacity of a seaman.   I say this is the whole of his offence ; for I will not admit the supposition that he is to be burdened with the offence of the captain in not carrying him out of the state.   He is himself shut up, he cannot go off; his removal depends upon another.   It is true the sale of him is suspended upon the conviction of the captain, and the captain has the power to rescue him from slavery.   But suppose the captain, as is very frequently the case, may find it his interest or his pleasure to get rid of him, and of the wages due him, his fate is suspended on the captain's caprice in this particular ; but it is the exercise of a dispensing power in the captain, and nothing more.   The seaman's crime is complete, and the forfeiture incurred, by the single act of coming into port ; and this even though driven into port by stress of weather, or forced by a power which he cannot control, into a port for which he did not ship himself: the law contains no exception to meet such contingencies.

The seaman's offence, therefore, is coming into the state, in a ship or vessel; that of the captain consists in bringing him in, and not taking him out of the state, and paying all expenses. Now, according to the laws and treaties of the United States, it was both lawful for this seaman to come into this port, in this vessel, and for the captain to bring him in the capacity of a seaman; and yet these are the very acts for which the state law imposes these heavy penalties. Is there no clashing in this? It is in effect a repeal of the laws of the United States, *pro tanto*, converting a right into a crime.

And here it is proper to notice that part of the argument against the motion, in which it was insisted on, that this law was passed by the state in exercise of a concurrent right. Concurrent does not mean paramount, and yet, in order to devest a right conferred by the general government, it is very clear that the state right must be more than concurrent.

But the right of the general government to regulate commerce with the sister states, and foreign nations, is a paramount and exclusive right; and this conclusion we arrive at, whether we examine it with reference to the words of the constitution, or the nature of the grant. That this has been the received and universal construction from the first day of the organization of the general government, is unquestionable; and the right admits not of a question any more than the fact. In the constitution of the United States—the most wonderful instrument ever drawn by the hand of man—there is a comprehension and precision that is unparalleled; and I can truly say,

that, after spending my life in studying it, I still daily find in it some new excellence.

It is true, that it contains no prohibition on the states to regulate foreign commerce. Nor was such a prohibition necessary; for the words of the grant sweep away the whole subject, and leave nothing for the states to act upon. Wherever this is the case, there is no prohibitory clause interposed in the constitution. Thus, the states are not prohibited from regulating the value of foreign coins, or fixing a standard of weights and measures, for the very words imply a total, unlimited grant. The words in the present case are, " to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." If congress can regulate commerce, what commerce can it not regulate ? And the navigation of ships has always been held, by all nations, to appertain to commercial regulations.

But the case does not rest here. In order to sustain this law, the state must also possess a power paramount to the treaty-making power of the United States, expressly declared to be a part of the supreme legislative power of the land ; for, the seizure of this man, on board a British ship, is an express violation of the commercial convention with Great Britain, of 1815. Our commerce with that nation does not depend upon the mere negative sanction of not being prohibited. A reciprocal liberty of commerce is expressly stipulated for, and conceded, by that treaty: to this the right of navigating their ships in their own way, and particularly by their own subjects, is necessarily incident. If policy requires any restriction of this right, with regard to a particular class of subjects

CHARLE'N, of either contracting party, it must be introduced by treaty.
August, 1823. The opposite party cannot introduce it by a legislative act
Elkison     of his own.   Such a law as this could not be passed even
v.          by the general government, without furnishing a just
Deliesseline. cause of war.

But to all this, the plea of necessity is urged ; and of
the existence of that necessity we are told the state alone
is to judge.   Where is this to land us?   Is it not asserting
the right in each state to throw off the federal constitu-
tion at its will and pleasure ?   If it can be done as to any
particular article, it may be done as to all : and, like the
old confederation, the union becomes a mere rope of sand.
But I deny that the state surrendered a single power
necessary to its security, against this species of property.
What is to prevent their being confined to their ships, if
it is dangerous for them to go abroad ?   This power may
be lawfully exercised.   To land their cargoes, take in
others, and depart, is all that is necessary to ordinary
commerce, and is all that is properly stipulated for in
the convention of 1815, so far as relates to seamen.   If
our fears extend also to the British merchant, the super-
cargo, or master, being persons of color, I acknowledge
that, as to them, the treaty precludes us from abridging
their rights to free ingress and egress, and occupying
houses and warehouses for the purposes of commerce.
As to them, this law is an express infraction of the treaty.
No such law can be passed consistently with the treaty,
and, unless sanctioned by diplomatic arrangement, the
passing of such a law is tantamount to a declaration of
war.

But if the policy of this law was to keep foreign free

persons of color from holding communion with our slaves, it certainly pursues a course altogether inconsistent with its object. One gentleman likened the importation of such persons to that of clothes infected with the plague, or of wild beasts from Africa; the other to that of fire-brands set to our own houses only to escape by the light. But surely if the penalty inflicted for coming here is in its effect that of being domesticated, by being sold here, then *we* ourselves inoculate our community with the plague, *we* ourselves turn loose the wild beast in our streets, and *we* put the fire-brand under our own houses. If there are evil persons abroad who would steal to this place in order to do us this mischief, (and the whole provisions of this act are founded in that supposition,) then this method of disposing of offenders by detaining them here, presents the finest facilities in the world for introducing themselves lawfully into the very situation in which they would enjoy the best opportunities of pursuing their designs.

Now, if this plea of necessity could avail at all against the constitution and laws of the United States, certainly that law cannot be pronounced necessary which may defeat its own ends; much less when other provisions of unexceptionable legality might be resorted to, which would operate solely to the end proposed, viz., the effectual exclusion of dangerous characters. On the fact of the necessity for all this exhibition of legislation and zeal, I say nothing : I neither admit nor deny it. In common with every other citizen, I am entitled to my own opinion; but when I express it, it shall be done in my private capacity.

CHARLE'N,
August, 1823.

Elkison
v.
Deliesseline.

But what shall we say to the provisions of this act as they operate on our vessels of war? Send your sheriff on board one of them, and would the spirited young men of the navy submit to have a man taken? It would be a repetition of the affair of the Chesapeake. The public mind would revolt at the idea of such an attempt: and yet it is perfectly clear that there is nothing in this act which admits of any exception in their favor.

Upon the whole, I am decidedly of the opinion, that the third section of the state act now under consideration, is unconstitutional and void, and that every arrest made under it subjects the parties making it to an action of trespass.

Whether I possess the power to administer a more speedy and efficacious remedy, comes next to be considered.

That a party should have a right to his liberty, and no remedy to obtain it, is an obvious mockery; but it is still greater to suppose that he can be altogether precluded from his constitutional remedy to recover his freedom.

I am firmly persuaded, that the legislature of South Carolina must have been surprised into the the passing of this act. Either I misapprehend its purport, or it is studiously calculated to hurry through its own execution, so as to leave the objects of it remediless. By giving it the form of a state prosecution, the prisoner is to be deprived of the summary interference of the United States' authority ; and by passing it through the sheriff's

hands, without the intervention of any court of justice, he is to be deprived of the benefit of the 25th section of the judiciary act, by which an appeal might be had to the supreme court. Thus circumstanced, it is impossible to conceal the hardships of his case, or deny his claim to some remedy.

CHARLE'N,
August, 1823.

Elkison
v.
Deliesseline.

The opposition to issuing the writ of habeas corpus is founded altogether on the ground that he is in custody under state authority ; and the proviso to the 14th section of the judiciary act of 1789 is relied on. That proviso is in these words : "Provided that writs of *habeas corpus* shall in no case extend to prisoners in gaol, unless where they are in custody under or by color of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into some court to testify."

Mr. King admits, that this proviso is fatal to his motion, unless his case be taken out of it, by one or both of the following considerations :

1st. That so far as it abridges the right of *habeas corpus*, it is inconsistent with that provision of the constitution which declares, that "the privilege of the writ of *habeas corpus* shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it ;"—a state of facts which cannot possibly be predicated of the present : or,

2d. That the prisoner cannot be said to be in confinement under state authority, if the state law be void under which he is arrested. And being by his national char-

acter entitled to the protection of this court, in other words, a constitutional suitor of the United States' courts, this, which is the only adequate remedy, should be extended to him.

These views of the subject certainly merit much consideration. Arguments in favor of this cherished right are not lightly to be passed over. But what are the *courts* of the United States to do? We cannot undertake to judge when that crisis has arrived which the constitution contemplates; nor are we to undertake to define and limit the meaning of those words, *the privilege of the writ of habeas corpus.* Every state in the union may have had different provisions limiting and defining the extent of this privilege; some, perhaps, confining themselves to the privilege as it stood at common law; others, adopting some or all of those statute provisions which have wrought such a change in its practical utility. It can, then, only be left to congress to give an uniform and national operation to this provision of the constitution. In legislating on this subject they have confined us to those cases in which the party is confined under United States' authority, or is necessary to be introduced into its courts as witnesses.

On the second point it is to be observed, that the proviso to the fourteenth section of the judiciary act imposes on the petitioner the necessity of maintaining the affirmative of his being *confined under United States' authority ;* so that it is not enough to negative his being in custody under state authority, for the consequence is only that he is confined arbitrarily, and without authority, by a state officer ; a case to which our power to issue this

writ does not extend.   As far as congress can extend, and
shall extend, the power to afford relief by this writ, I trust
I shall never be found backward to grant it.   At present
I am satisfied that I am not vested with that power in
this case.

<div style="float:right">CHARLE'N,<br>August, 1823.<br><br>Elkison<br>v.<br>Deliesseline.</div>

We come next to consider the motion for the writ *de
homine replegiando.*

And here the question appears to me to be " what right
I have to refuse it?"   As well might I interpose to prevent
the petitioner from suing out his writ for trespass and false
imprisonment, or the captain his writ for trespass in
taking the seaman from his vessel, or the ordinary writ
of replevin on distress for rent, as to refuse this writ *de
homine replegiando.*  If it is not the proper writ for his
case, he must take the consequence; but this is not the
time and mode to try that question.   It is a writ of
common right, and contains upon the face of it its own
death-warrant if it be not legally grantable in any par-
ticular case.   If the return of the party to whom it
issues, shows that it is not a case proper for the remedy
intended to be given, there it ends.   If the return be
false, it may be contested; if true, and it presents a proper
case, then another writ issues, which brings in question
the right of personal freedom.   The whole of this is set
forth in the *registrum breviun,* and in Fitzherbert, which
is nearly copied from it.

If my opinion extrajudicially be asked, I would ex-
press the most serious doubt whether this writ could avail
the party as against the sheriff; but as against his vendee,

there is not a question that it will well lie at common law.

But gentlemen contend, that this writ is obsolete; that "it is not to be raked up from the ashes of the common law, to be now first used against the state of South Carolina;" that it cannot issue when the *habeas corpus* cannot issue; and finally, that the writ of ravishment of ward is the only writ established by a law of the state as the proper writ to try the question of freedom of a person of color, and no other can be substituted without changing the law respecting slaves.

There is not one of these arguments that can be sustained either in law or fact. The writ *de homine replegiando* is ingrafted by law into the jurisprudence of South Carolina; nor is it unknown in actual practice, in cases to which it is applicable. In the State of New York, it is familiarly used. It is true, that the writ of ravishment of ward is expressly given by a state law; but it is given in favor of those who are by law declared to be *prima facie* held to be slaves. It curtails no right of a freeman, previously existing; and only operates to give an action to one whose condition or situation places him in absolute duress, or to any other who shall charitably volunteer in his behalf as guardian. But the act under consideration furnishes itself the distinction between ordinary cases and the present. This act operates only as to freemen—free persons of color, and not as to slaves, so that a whole crew of slaves entering this port would be free from *its* provisions. It is an indispensable attribute of the individual affected by it, that he should be free. If he is not, the sheriff is not authorized by it to touch him:

and, although forbid by other laws to remain here, his coming here does not expose him to seizure and imprisonment under the provision of this law, whether it be constitutional or not. The negro act of '47 supposes him a slave : the present act supposes him a freeman. Several other answers might be given to the argument; but this one is sufficient. We do not pretend to a right to encroach on the power of the state over its slave population. The power remains unimpaired. But under a state law, this man is recognized as a freeman, and in that view, if in no other, we are fully authorized to treat him as such.

As to the argument that this writ cannot issue, where the writ of *habeas corpus* cannot issue, it was fully answered by the petitioner's counsel. If the argument proves any thing, it leads to the contrary conclusion.

Upon the whole, I am led to the conclusion,

That the third clause of the act under consideration is clearly unconstitutional, and void ; and the party petitioner, as well as the ship-master, is entitled to actions as in ordinary cases :

That I possess no power to issue the writ of *habeas corpus ;* but for that remedy he must have recourse to the state authorities :

That as to the writ *de homine replegiando,* I have no right to refuse it ; but, although it will unquestionably lie

CHARLE'N,
August, 1823.

Elkison
v.
Deliesseline.

CHARLE'N,    to a vendee under the sheriff, I doubt whether it can avail
August, 1823.  the party against the sheriff himself.  The counsel will
Elkison      then consider whether he will sue it out.
v.
Deliesseline,